# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-13-00069-CV

**Clifton E. Wolf, Melba R. Wolf, Mary Ellen Castillo, and James Allen Reinarz, M.D., Appellants**

**v.**

**Highland Haven Property Owners Association, Inc.;
Shady Acres Property Owners Association, Inc.; and Kathleen Barnett,
as Independent Executrix of the Estate of Chester Arthur Barnett, Appellees**

### FROM THE DISTRICT COURT OF BURNET COUNTY, 33RD JUDICIAL DISTRICT
### NO. 31,997, HONORABLE GUILFORD L. JONES III, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellants Clifton E. Wolf, Melba R. Wolf, James Allen Reinarz, and Mary Ellen Castillo appeal a final summary judgment in favor of the Shady Acres Property Owners Association, Inc. (SAPOA), appellee, on claims asserted by appellants challenging the applicability of an express easement to real property that appellants own. SAPOA's asserted grounds for summary judgment were res judicata and collateral estoppel by virtue of a 1989 judgment granting SAPOA injunctive relief enforcing the same easement against two of the appellants. We will affirm the district court's judgment.

**BACKGROUND**

The real property at issue (the Subject Property) is within a Burnet County subdivision known as Shady Acres, Section 2, which abuts the shores of Lake LBJ. This subdivision was developed in the early 1960s by Chester Arthur Barnett and his wife, Kathleen. The Barnetts established the subdivision by plat filed in the Burnet County plat records in June 1960. The plat states that the Barnetts had acquired the property being subdivided under two deeds recorded in the Burnet County deed records, citing volume and page. On the same day they filed the plat, the Barnetts also filed in the county deed records a set of restrictive covenants calculated to preserve a residential character in the subdivision. Additionally, the plat and restrictions burdened certain property within the subdivision with easements that included a "Lake Access Easement for Lot Owners in the Shady Acres Subdivisions" authorizing "temporary use in launching and landing boats, temporarily keeping boats at the water's edge and temporarily tied up to the land, and for temporarily parking of automobiles while fishing or boating." At all relevant times, appellee SAPOA has been empowered to enforce this and other restrictions in the subdivision on behalf of the lot owners there.

Following the Barnetts' creation of Shady Acres, Section 2, they executed a 1963 deed purporting to convey the Subject Property to Horace B. and Lucy M. Pendleton. In 1966, the Pendletons executed a deed conveying the Subject Property to appellants Clifton Wolf (Wolf) and Reinarz.[1] As described in the 1966 deed, the Subject Property consists of two tracts of land

---

[1] At the time the 1966 deed was executed, Reinarz was married to Castillo, and all appellants acknowledge that Castillo owns a 50% community-property interest in any interest Reinarz acquired in the Subject Property under that deed. In contrast, appellant Melba Wolf, who has been married

2

encompassing the southern end of a peninsula that extends southward into Lake LBJ. Tract One consists of four lots (lots 156 through 159) that lie along the peninsula's eastern edge and are the southernmost of the subdivision's lots that are located on the peninsula. Tract Two encompasses the portions of the peninsula that lie to the south and west of tract one—and that, as the deed acknowledges, are burdened by the Lake Access Easement.

In 1988, SAPOA and its directors sued Clifton and Reinarz seeking injunctive relief compelling them to remove a fence and cease restricting Shady Acres's other lot owners' access to the portion of the Subject Property that is burdened by the Lake Access Easement (i.e., the Tract Two described in the 1966 deed). The plaintiffs subsequently added monetary claims based on allegations that Wolf had damaged a new boat ramp that SAPOA had constructed within the easement. Wolf and Reinarz counterclaimed for a declaration that they owned Tract Two in fee simple and "unencumbered by any easement."[2] Specifically, Wolf and Reinarz alleged that they had acquired fee title to the Subject Property from the Pendletons, the successors to the Barnetts, the subdivision's original developers, and that while their 1966 deed and the subdivision restrictions purported to impose the Lake Access Easement on Tract Two within the Subject Property, that easement had been abandoned.

---

to Clifton Wolf at least during the current litigation, does not appear to claim any interest in the Subject Property by virtue of the 1966 deed. Rather, as we will explain below, her claims in the current litigation, like the claims currently asserted by the other appellants, are predicated on assertions of title to certain portions of the Subject Property that derive from bases other than the 1966 deed. Nonetheless, there is no dispute that both Castillo and Melba Wolf are in privity with Reinarz and Wolf with respect to the litigation that ensued during the 1980s, which we will describe shortly.

[2] They also challenged the standing of SAPOA and various of the individual plaintiffs.

The parties' claims were tried to the bench in February 1989. After hearing evidence, the district court rendered judgment for SAPOA and other plaintiffs, holding specifically that Tract Two within the Subject Property was burdened by the Lake Access Easement, that this easement benefitted lot owners in both Shady Acres Section 2 and an earlier Section 1 that the Barnetts had developed, that the easement was an easement appurtenant, and that the rights expressly enumerated in the easement encompassed the incidental right to construct, maintain, or repair a boat ramp. The court permanently enjoined Wolf, Reinarz, and their heirs and assigns from interfering with the rights of the plaintiffs, heirs and assigns under the easement, and further compelled them to remove the fence and other obstructions on Tract Two. The district court further awarded the plaintiffs attorney's fees, plus actual and exemplary damages related to Wolf's damaging of the boat ramp. The district court subsequently made findings of fact and conclusions of law that included the following of note:

9.  Shady Acres Subdivision, Section Two, was uniformly restricted by covenants and restrictions filed in Volume 125, page 484, of the Deed Records of Burnet County, Texas.

. . .

11.  Defendants purchased Lots 156, 157, 158, and 159, Shady Acres, Section Two, Burnet County, Texas, as well as adjoining property depicted on the plat of said Section Two, Shady Acres Subdivision, subject to an easement depicted on said plat and described on said plat as "Lake Access Easement for Lot Owners in Shady Acres Subdivisions."

12.  Defendants are the present fee owners of said property.

13.  Lot owners within both Sections One and Two of Shady Acres Subdivision[] have an expressed easement over all of the tract of land in Section Two designated "Lake Access Easement for Lot Owners in Shady Acres

4

Subdivisions" for the limited purposes set out in the easement grants of the Subdivision "Restrictions."

14.     Such easement is an easement appurtenant.

. . .

33.     The easement depicted as "Lake Access Easement for Property Owners in Shady Acres Subdivisions" has not been abandoned.

. . .

48.     Defendants' use of the easement area in question has not been exclusive or adverse to that of the property owners of Shady Acres Subdivision.

49.     Defendants have not acquired limitation title to defeat the expressed easement granted Plaintiffs and other lot owners in Shady Acres Subdivision.

Wolf and Reinarz did not appeal this judgment.

Beginning in 2002, however, Wolf and Reinarz, eventually joined by both of the other appellants, prosecuted another declaratory-judgment claim against SAPOA challenging the extent to which the Lake Access Easement burdened the Subject Property. But their legal theory changed—this time, appellants asserted that the Subject Property (or more specifically Tract Two of it) was not burdened by the Lake Access Easement because the Barnetts had not actually owned that portion of the property when they had imposed the easement in 1960 and when they had initially sold the Subject Property to the Pendletons in 1963.[3] Appellants further alleged that in 2001, this portion of the Subject Property had been acquired from the successors to the actual owners by the property owners' association for an adjacent subdivision, the Highland Haven Property Owners'

_____

[3] According to appellants, Barnett had owned only about 25-30% of the Subject Property, all but a small, immaterial sliver of which lay within Tract One.

5

Association, Inc. (HHPOA), from which appellants had acquired it through a 2002 quitclaim deed and adverse possession. Based on the same core allegations, appellants also asserted claims against HHPOA as well as Kathleen Barnett, in her capacity as executor of her now-late husband's estate.[4]

SAPOA moved for partial summary judgment that appellants take nothing on their claim against it, asserting that the claim was barred by res judicata and collateral estoppel from the 1980s litigation. In support, SAPOA presented the clerk's record from the 1980s litigation, including pleadings, the district court's judgment, and the court's findings of fact and conclusions of law. Thereafter, SAPOA and appellants stipulated to several facts and legal conclusions for purposes of SAPOA's summary-judgment motion only. Among these, they agreed that the Subject Property is part of the Shady Acres Subdivision, Section 2; that Section 2 was established by the plat filed in 1960, which also reflected that Chester Barnett owned the property being subdivided by virtue of two recorded deeds; that the Pendletons had purchased the Subject Property from Chester Barnett in 1963; that the Pendletons had subsequently sold the Subject Property to appellants in 1966; and that genuine issues of material fact existed as to "whether Chester Barnett owned the [S]ubject [P]roperty when Section Two was platted" and "when he deed[ed] the property to Horace B. and Lucy M. Pendleton."

---

[4] Against Barnett, appellants asserted contract and fraud theories and sought a full refund of purchase money that had allegedly been paid to Chester Barnett for the Subject Property under a debt obligation that Wolf and Reinarz had assumed from the Pendletons as part of their consideration for the 1966 deed. Regarding HHPOA, appellants alleged that while the association's 2002 quitclaim deed had fixed most of their title problems with the Subject Property, that deed had inadvertently omitted a portion of the property located on the southern tip of the peninsula. Accordingly, appellants asserted alternative trespass-to-try-title and quiet-title claims seeking to establish their title to the omitted property based on adverse possession.

Appellants filed a response to SAPOA's summary-judgment motion, relying in part on the stipulations and an affidavit from Wolf to the effect that he did not know and had no reason to know of any discrepancy regarding the Barnetts' ownership of the Subject Property during the 1980s litigation. In that regard, Wolf purported to give several opinions regarding the practices of surveyors and title companies. This prompted SAPOA to file written objections to these opinions as unqualified expert opinion testimony under the *Havner/Robinson* analysis.[5] SAPOA also asserted hearsay objections to testimony by Wolf in which he purported to recount certain assertions by Kathleen Barnett.

Following a May 2006 hearing, the district court sustained SAPOA's objections to Wolf's affidavit by written order and, subsequently, signed a separate order granting SAPOA's motion for partial summary judgment without specifying the grounds on which it relied. It would be several more years before appellants' remaining claims were resolved.[6] The case would finally conclude with a trial solely concerning the award of attorney's fees to SAPOA under the Uniform Declaratory Judgments Act,[7] following which the district court signed a December 2012 final judgment incorporating its prior interlocutory rulings and awarding SAPOA $1,250 in trial-level attorney's fees, plus contingent appellate attorney's fees. Appellants perfected an appeal from this judgment.

---

[5] *See Merrell Dow Pharms. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997); *E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 556–57 (Tex. 1995).

[6] Appellants' adverse-possession claim against HHPOA was resolved by a 2007 agreed interlocutory judgment awarding them that relief. Appellants' claims against Kathleen Barnett were eventually dismissed, over appellants' opposition, for want of prosecution in 2010.

[7] *See* Tex. Civ. Prac. & Rem. Code § 37.009.

**ANALYSIS**

Appellants bring two issues seeking reversal of the portions of the final judgment awarding relief to SAPOA.[8]  In their first issue, appellants urge that the district court erred in granting summary judgment based on res judicata.  In their second issue, they challenge the alternative summary-judgment ground of collateral estoppel.  Appellants do not otherwise challenge the judgment award of attorney's fees, nor do they complain of the district court's ruling excluding portions of Wolf's affidavit.

We review summary judgments de novo.  *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 156 (Tex. 2004).  Summary judgment is proper when there are no disputed issues of material fact and the movant is entitled to judgment as a matter of law.  Tex. R. Civ. P. 166a(c); *Western Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005).  We take as true all evidence favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts in the non-movant's favor.  *Id.*  Where as here, the summary judgment does not specify the grounds on which the trial court relied in its ruling, we will affirm if any of the grounds presented to the district court and preserved for appellate review is meritorious.  *See Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 217 (Tex. 2004).

Res judicata and collateral estoppel are both affirmative defenses.  *See* Tex. R. Civ. P. 94.  Consequently, to obtain summary judgment based on either of these grounds, SAPOA had

---

[8]  As our caption reflects, appellants' notice of appeal also identified Barnett and HHPOA as appellees.  However, appellants assign no error with respect to these parties and acknowledge that "[n]o other parties" besides SAPOA "form a basis for this appeal."  Appellants have thereby waived any appellate complaints regarding Barnett and HHPOA.  *See Secure Comm, Inc. v. Anderson*, 31 S.W.3d 428, 431 (Tex. App.—Austin 2000, no pet.).

the initial burden of conclusively establishing each of that defense's essential elements.  *See Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010).  Assuming it met that burden, and only if it did, the burden would then shift to appellants to present summary-judgment evidence raising a genuine issue of material fact as to at least one element.  *See Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996).  Appellants insist that they presented summary-judgment evidence raising "fact issues" regarding asserted defects in the Barnetts' title, when appellants might have discovered the defects, and whether a SAPOA officer might have acknowledged them in the early 2000s.  However, as appellants seem to acknowledge, the materiality of any such "fact issues," and the propriety of this summary judgment generally, instead rests initially and principally on the application of the legal principles of res judicata and collateral estoppel to undisputed facts concerning the 1980s litigation that are reflected by the court papers contained in the summary-judgment record.

We will begin by considering whether SAPOA was entitled to summary judgment on its res judicata defense, the focus of appellants' first issue.  Simply described, res judicata, also known as claims preclusion, bars the relitigation of a claim or cause of action that has been finally adjudicated, thereby preventing the splitting of a cause of action, and likewise bars claims or causes of action that are deemed to be ones that the claimant should have raised in the prior suit.  *See Barr v. Resolution Trust Corp.*, 837 S.W.2d 627, 628–29, 631 (Tex. 1992).  "The policies behind the doctrine reflect the need to bring all litigation to an end, prevent vexatious litigation, maintain stability of court decisions, promote judicial economy, and prevent double recovery."  *Id*. at 629 (citing Zollie Steakley & Weldon U. Howell, Jr., *Ruminations on Res Judicata*, 28 Sw. L.J. 355, 358–59 (1974)).  The elements of the res judicata defense are:  (1) a prior final determination on the

9

merits by a court of competent jurisdiction; (2) identity of parties, or those in privity with them, in the prior and subsequent actions; and (3) the subsequent action is based on claims or causes of action that were or should have been raised in the first action. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). Only the third element is contested here—whether appellants' current declaratory claim against SAPOA asserts the same claim or cause of action that Wolf and Reinarz asserted in the 1980s litigation, or is otherwise considered to be one that should have been raised there.

In determining whether a claim or cause of action not asserted in a prior action is considered to be one that should have been raised there, Texas follows the "transactional approach," which, generally stated, looks to whether the subsequent claim or cause of action arises out of the same subject matter as the previous action and which, through the exercise of "diligence," could have been litigated in the previous suit. *See Barr*, 837 S.W.2d at 631. "A determination of what constitutes the subject matter of a suit necessarily requires an examination of the factual basis of the claim or claims in the prior litigation," looking to "the gist of the complaint, without regard to the form of action." *Id*. at 630; *see also Pinebrook Props., Ltd. v. Brookhaven Lake Prop. Owners Assoc.*, 77 S.W.3d 487, 496 (Tex. App.—Texarkana 2002, pet. denied) (describing the analysis in terms of whether the cases "share the same nucleus of operative facts," as opposed to "the legal theories presented"). "Any cause of action which arises out of those same facts should, if practicable, be litigated in the same lawsuit." *Barr*, 837 S.W.2d at 631. These inquiries are further guided by the concept that a final judgment in an action should bar subsequent suits based on the same "transaction," or series of connected "transactions," out of which the first action arose. *See id*.

10

at 631 (citing Restatement (Second) of Judgments § 24(1) (1982)). Whether a set of underlying facts amounts to a "transaction" should be made "pragmatically, 'giving weight to such considerations as whether the facts are related in time, space, origin or motivation, whether they form a convenient trial unit, and whether their treatment as a trial unit conforms to the parties' expectations or business understanding or usage.'" *Id*. (quoting Restatement (Second) of Judgments § 24(2)).

In attempting to distinguish their current action against SAPOA from the 1980s litigation, appellants characterize the latter as concerning "whether lot owners within the Shady Acres, Section Two subdivision could use [Tract Two] with uninterrupted access . . . , and whether such area that had been platted as a recreational easement was an 'easement appurtenant,'" whereas their focus now is whether the Barnetts owned that property and, relatedly, how appellants acquired title to it. In these ways, appellants reason, their present claim is based on a different set of operative facts from the 1980s litigation. But, as SAPOA emphasizes, it remains that appellants' current claim against it ultimately seeks the identical relief that Wolf and Reinarz sought against it in the 1980s litigation—a declaration that Tract Two of the Subject Property is not burdened by the Lake Access Easement. Further, as SAPOA also observes, Wolf and Reinarz previously litigated, and the district court previously adjudicated, the same operative facts that would control the disposition of appellants' current claim—whether and how they owned fee title to the Subject Property and, relatedly, whether Tract Two was burdened by the Lake Access Easement. All that is different is that appellants have changed their position on these issues—whereas Wolf and Reinarz alleged that they owned fee title to the Subject Property as successors to the Barnetts and Pendletons, but attacked the applicability of the Lake Access Easement under a theory of

11

abandonment or adverse possession, appellants now attack their chain of title from the Barnetts. As SAPOA suggests, this amounts to an alternative counterclaim or defensive theory that logically belonged in the 1980s litigation but was never asserted there. Preventing such "two bites at the apple" is a core purpose of the res judicata doctrine. *See id.*

We conclude that appellants' current declaratory claim against SAPOA—if not merely a reprise of the very same claim or cause of action that was asserted in the 1980s litigation—falls well within the same subject matter as that prior action, should have been asserted back then, and is barred by the 1980s judgment now. *See id.*; *see also Pinebrook Props.*, 77 S.W.3d at 497–98 (holding res judicata barred consideration of claims relating to restrictive covenant that were previously adjudicated). In insisting otherwise, appellants attempt to frame their argument within the rubric of "changed circumstances," i.e., the concept that a judgment is only res judicata with respect to facts and conditions that existed at the time of judgment and does not bar subsequent litigation when material facts or applicable legal principles have changed in the interim. *See, e.g.*, *Hudspeth v. Hudspeth*, 673 S.W.2d 248, 252–53 (Tex. App.—San Antonio 1984, writ ref'd n.r.e.) (holding that subsequent lawsuit was not barred by res judicata because the cause of action "arose subsequent to the entry of the prior judgment"). For the requisite "changed" or "new" facts that have arisen since the 1980s judgment, appellants cite the series of conveyances in 2001 and 2002 through which HHPOA purportedly acquired most of the Subject Property, including virtually all of Tract Two, and then deeded it to them. However, these events do not represent *changes in* the material facts that existed as of the time of the 1980s judgment, but only claims or potential claims predicated on a new or revised *theory* or *view of* those material facts. The Barnetts either owned

12

or did not own all of the Subject Property in 1960 or 1963 based on a state of facts that existed as of those times. The same is true of the interests that the Pendletons and then Wolf and Reinarz acquired under their respective deeds. The 2001 and 2002 events that appellants emphasize amount at most to later-discovered (or later-created) evidence regarding what the controlling state of facts might have been back in the 1960s. The 1980s judgment bars appellants from relitigating these facts against SAPOA.

Appellants' attempts to avoid res judicata's bar ultimately come down to the assertion that Wolf and Reinarz "could not and should not have known, through the exercise of ordinary diligence" at the time of the 1980s litigation, about the now-asserted defects in their chain of title from the Barnetts. Leaving aside whether this assertion—essentially a claim of "newly discovered evidence"—is even material to the concept of "diligence" under res judicata principles,[9] we note that appellants are charged with constructive notice of the actual knowledge of the Subject Property's ownership they could have acquired by examining the Burnet County public records. *See Ford v. Exxon Mobil Chem. Co.*, 235 S.W.3d 615, 617 (Tex. 2007) (per curiam) ("While not all public records establish an irrebuttable presumption of notice, the recorded instruments in a grantee's chain of title generally do."); *Mooney v. Harlin*, 622 S.W.2d 83, 85 (Tex. 1981) ("A person is charged with constructive notice of the actual knowledge that could have been acquired by examining public records."). As previously noted, the 1960 plat establishing Shady Acres, Section 2, cited the volume

---

[9] And one can imagine the upheaval and instability that would result among Texas real property owners if, as appellants suggest, former litigants in long-settled disputes over easements, boundaries, and title could revisit final judgments based on claims of "new" evidence that they or their predecessors overlooked the first time.

and page of the county deed records where could be found the deeds under which the Barnetts claimed title to the property within the subdivision. Further, the only summary-judgment evidence that appellants presented in an attempt to controvert the presumption of actual notice was contained in the portions of Wolf's affidavit that the district court excluded—and appellants do not challenge that ruling on appeal.

In sum, SAPOA established its affirmative defense of res judicata as a matter of law, and appellants did not raise any issue of material fact that would be a basis for denying it summary judgment. Consequently, the district court did not err in granting summary judgment on that ground and, accordingly, we overrule appellants' first issue. Further, because SAPOA's res judicata ground is singularly sufficient to support summary judgment, we need not reach appellants' second issue regarding collateral estoppel. *See Knott*, 128 S.W.3d at 217; *see also* Tex. R. App. P. 47.1.

## CONCLUSION

We affirm the district court's judgment.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Field

Affirmed

Filed: August 29, 2013